UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,            Case No. 3:22-cr-225

       Plaintiff,

v.            MEMORANDUM OPINION
           AND ORDER

Andy Ross Thomas,

       Defendant.

## I. INTRODUCTION AND BACKGROUND

On October 15, 2020, Defendant Andy Ross Thomas was indicted by a grand jury on one count of knowingly making a false statement during the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2). (*See* Case No. 3:20-cr-634) (the "2020 case"). The indictment was sealed, and a warrant was issued for Thomas's arrest.[1]

One month later, Toledo Police officers Morgan Balboa and Patrick Hohenberger conducted a traffic stop on a vehicle they observed traveling in excess of the posted speed limit and failing to make a complete stop at a stop sign. The car was registered to Thomas, but driven by Keonna Hudson, Thomas's girlfriend. Hudson also had a warrant for her arrest, leading Balboa and

---

[1] A grand jury subsequently returned a superseding indictment, which charged Thomas with an additional count of possession of a firearm while subject to a court order, in violation of 18 U.S.C. § 922(g)(8) and 924(a)(2). (Case No. 3:20-cr-634, Doc. No. 23). That possession charge arose from events separate from the events at issue in this case. The 2020 case proceeded to a jury trial, after which Thomas was found guilty of both counts charged in the superseding indictment. (*Id.*, Doc. No. 74). Thomas currently is awaiting sentencing in the 2020 case.

Hohenberger to take her into custody. Hudson asked if she could call Thomas to come and get the car. The officers, knowing Thomas had a warrant for his arrest in the 2020 case, agreed.

Thomas arrived in a second car, alone. Balboa and Hohenberger confirmed his identity and then placed him under arrest. Thomas, realizing he now had two cars with no drivers, asked the officers to park the cars so that they would not be towed. The officers again agreed. Hohenberger searched both cars prior to moving them. Those searches uncovered drug paraphernalia and, in the trunk of the second car, a gun. Thomas ultimately was charged by indictment with one count of knowingly possessing a firearm while subject to a court order, in violation of 18 U.S.C. § 922(g)(8) and 924(a)(2). (Doc. No. 1).

Thomas seeks to suppress evidence uncovered during the search of his vehicles. (Doc. No. 6). The government filed a brief in opposition to the motion, (Doc. No. 9), and Thomas filed a brief in reply. (Doc. No. 11). I then set the motion for an evidentiary hearing, which occurred on December 5, 2022. The parties requested the opportunity to submit post-hearing briefs. Those briefs have been filed, (Doc. Nos. 23 and 24), and the motion is decisional. For the reasons stated below, I grant Thomas's motion in part and deny it in part.

## II. ANALYSIS

### A. INVENTORY SEARCH

The Fourth Amendment generally requires law enforcement officers to obtain a warrant, based upon probable cause, before searching a location in which an individual has a reasonable expectation of privacy. *See, e.g., Carpenter v. United States*, 138 t. 2206, 2213 (2018) ("When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.") (further citation omitted). Probable cause is the "reasonable grounds for belief" that evidence of a crime may be

2

found in a certain place or location. *United Stated v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In the absence of probable cause, the Fourth Amendment permits the police to conduct an inventory search of a vehicle prior to towing it. *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007) ("A valid inventory search conducted without a warrant does not violate the Fourth Amendment." (citing *South Dakota v. Opperman,* 428 U.S. 364, 369-71 (1976))); *see also United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (officers may impound a vehicle even if "alternatives to impoundment might exist").

It is true that "[t]he Fourth Amendment permits impoundment decisions and inventory searches that are objectively justifiable, . . . regardless of an officer's subjective intent." *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (citing *Whren v. United States,* 517 U.S. 806, 812 (1996)). But there also "must be some set of guiding principles that govern the scope of inventory searches," whether written or unwritten. *United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). Officers must "follow 'standardized criteria . . . or established routine' to assure that inventory searches are not 'a ruse for a general rummaging in order to discover incriminating evidence.'" *Hockenberry*, 730 F.3d at 659 (quoting *Wells*, 495 U.S. at 4).

There is no real dispute in this case as to whether the officers were permitted to conduct an inventory search of Thomas's cars. Toledo Police Department Directive 406.3 lays out what officers must do, may do, and must not do when circumstances require that a motor vehicle be towed from the scene of an incident. (*See* Doc. No. 9-2). This policy states that officers must conduct an inventory search before they have a vehicle towed or – as also applies here – before a vehicle is "left

3

legally parked at the scene following a police incident." (*Id.* at 4). In these circumstances, officers "shall exercise reasonable care of a vehicle taken from the immediate physical possession of an arrestee," and they are required to remove and book certain enumerated items "in accordance with established procedures." (*Id.*).

Thomas argues Directive 406.3 is insufficient under Sixth Circuit precedent because, while it includes guidelines "about *when* inventory searches would be appropriate," it does not include any "'established procedures that govern *how* the inventory searches were to be conducted.'" (Doc. No. 24 at 6) (quoting *Alexander*, 954 F.3d at 916) (emphasis added by Thomas). In his view, "the record reveals a total absence of policy governing the scope, method, or priority of an inventory search." (Doc. No. 24 at 6).

The Sixth Circuit has not provided much guidance in this area. In *Alexander* – one of a relative handful of cases to focus on the manner in which inventory searches are conducted rather than the circumstances that permit the searches in the first place – the police department which conducted the search did not have a written policy governing the scope of inventory searches, and officer testimony did not establish "any [unwritten] standard procedures for how inventory searches are performed." *Alexander*, 954 F.3d at 916. The *Alexander* court concluded the department policies did not comply with constitutional requirements and declined to apply the inventory search exception, though that court ultimately upheld the district court's denial of the defendant's suppression motion under the inevitable discovery doctrine. *Id.* at 916-17.

In this case, Directive 406.3 requires officers to book all items of evidentiary or monetary value, whether in the driver's compartment, the glove box, or the trunk. (Doc. No. 9-2 at 4). It instructs officers to "inventory all locked compartments within the towed vehicle if keys to said compartments are readily available." (*Id.* at 5). It also requires officers to create a list of "[a]ll property, whether in plain sight or found as a result of a search or inventory, which is left in a towed

4

vehicle" and to include that list on the impound report or a supplemental crime report. (*Id.*) Further, Toledo Police Sergeant James E. Taylor, Jr., testified officers are trained to conduct inventory searches of "[e]verything" in the car, "[a]nything that's accessible." (Doc. No. 20 at 13).

But even if I conclude the Toledo Police tow and inventory search policy is sufficient, the record in this case establishes the officers did not follow that policy. "Even when there is an appropriate policy in place, inventory searches run afoul of the Fourth Amendment if they are performed only for the purpose of investigation." *Alexander*, 954 F.3d at 916, n.2.

Hohenberger testified he and Balboa thought they might find a gun or drugs in the car Hudson was driving, because they knew Thomas had a warrant for his arrest for a gun charge in the 2020 case. (Doc. No. 20 at 25). While Hohenberger testified his suspicion about the possibility of finding a gun did not alter his conduct in executing the searches, (*id.* at 26), the body camera recordings and the documentation resulting from the searches demonstrate that those searches were undertaken for the "sole purpose of investigation." *Hockenberry*, 730 F.3d at 659 (citation and internal quotation marks omitted).

I begin with the impound report. As I noted above, Directive 406.3 mandates that officers list on the impound report and, if necessary, a supplemental crime report, "[a]ll property, whether in plain sight or found as a result of a search or inventory, which is left in a towed vehicle." (Doc. No. 9-2 at 5). The impound report Balboa and Hohenberger completed after Thomas's arrest does not identify any property, whether booked with Thomas or left in the vehicle. (*See* Gov't Ex. 10, Dec. 5, 2022 suppression hearing). But there is no dispute that there were items of value in Thomas's car. For instance, Hohenberger's body camera records a cell phone and tablet on the passenger seat of the car.[2]  (Doc. No. 10, Ex. A2 at 13:20). Hohenberger acknowledged those items were in the

---

[2] The government's argument that the body camera recordings are sufficient to document the contents of the vehicles, (Doc. No. 23 at 9), is unavailing, as there is no evidence in the record that

5

vehicle, (Doc. No. 20 at 63), and they plainly were items "of value" which Directive 406.3 mandated be booked with Thomas or included in the impound report. (Doc. No. 9-2 at 4).

The government argues that the "failure to do a thorough inventory, or fill out the form, is not a basis to conclude [the search] was impermissible in the first place." (Doc. No. 23 at 9). It is true officers are permitted "a measure of flexibility" in implementing inventory search procedures. *Hockenberry*, 730 F.3d at 659 (citation and internal quotation marks omitted). And, standing alone, perhaps the officers' failure to record any of Thomas's property on the impound report would suggest a disinterest in paperwork or, as the government suggests, a lack of awareness about the value of some of the items in the car.[3] (*See* Doc. No. 20 at 109-110; Doc. No. 23 at 9).

But the barebones impound report does not stand alone. The body camera recordings reveal the officers' singular focus on finding a gun in Thomas's car. They searched under seats, in glove boxes and center consoles, and in the trunks of the vehicles, quickly shuffling through papers and clothing while apparently looking only for large items. (*See, e.g.,* Doc. No. 10, Ex. A2 at 14:05-14:50). Balboa acknowledged she did not look in the pockets of items in the trunk of the car Hudson was driving, even though those items could have contained money, passports, and other items of value. (Doc. No. 20 at 98).

The officers also demonstrated that their understanding of the inventory search policy exceeded the written parameters of Directive 406.3 and resulted in searches that exceeded constitutional limitations. Hohenberger testified he did not believe there are any limits on where he

---

Directive 406.3 or standard Toledo Police procedures permit officers to substitute body camera footage in place of the written documentation requirements of Section 4 of Directive 406.3.

[3] This explanation, even under the most favorable of views, is only a partial one. This is not a situation in which officers merely failed to record every item of value they found. *Cf. Hockenberry*, 730 F.3d at 660-61. It bears repeating that the officers in this case documented only that they found a "glass crack pipe" in the center console and a firearm in the trunk of Thomas's car. (Doc. No. 12 at 3). They did not record any of the noncontraband items, even those of obvious value like Thomas's cell phone and tablet.

6

could search in a car, or how he could search. (Doc. No. 20 at 45-46). Similarly, Balboa testified she was not aware of any guidance on the method of conducting an inventory search and that officers had "complete discretion" on how they would search. (*Id.* at 91-92). While Hohenberger testified during the government's re-direct examination that Directive 406.3 does contain limitations on how an inventory search may be conducted, he did so only after having an opportunity to read the tow policy while on the witness stand. (*Id.* at 71-72).

I conclude this sequence of events demonstrates Hohenberger was not aware of the tow policy limitations at the time of the search and thus he could not have conducted the search in compliance with those restrictions. *See, e.g., United States v. Kyle*, No. 1:21-CR-255, 2021 WL 3720924, at *2 (N.D. Ohio Aug. 23, 2021) (declining to credit testimony about written inventory search policy where officer's "knowledge of and testimony about the policy came largely through leading questions or other prompting from counsel").

"It is well-established that law enforcement officers may make a warrantless search of a legitimately seized vehicle provided the inventory is conducted according to standardized criteria or established routine." *United States v. Hurst*, 228 F.3d 751, 758 (6th Cir. 2000) (citing *Colorado v. Bertine,* 479 U.S. 367, 374 n.6 (1987), and *Opperman,* 428 U.S. at 372). Those standardized processes are an integral part of the calculus, "a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function" upon which the inventory search exception to the Fourth Amendment warrant requirement is based. *Opperman*, 428 at 375.

The purported inventory search in this case did not follow standardized criteria or established routine, either during or after the search. While the evidence does not suggest the officers acted maliciously or in bad faith, I conclude the record establishes the search was "performed only for the purpose of investigation" and, therefore, the inventory search exception does not apply. *Alexander*, 954 F.3d at 916, n.2.

7

The government also argues officers had probable cause to search the vehicle because they had discovered an apparent crack pipe. But the evidence indicates the officers found the item "inside of the closed [center] console" while conducting the purported inventory search. (Doc. No. 20 at 64); (*see also id.* at 64-66). But the inventory search exception to the warrant requirement does not apply, nor does the plain-view doctrine. In short, the officers did not have a justifiable reason to open the console and take possession of the pipe. Therefore, the crack pipe cannot provide probable cause to search the remainder of the vehicle.

I conclude no exception to the Fourth Amendment warrant requirement applies and, therefore, the search of Thomas's vehicle was unconstitutional. I grant his motion to suppress the evidence uncovered as a result of that search.

### B. POST-ARREST STATEMENTS

Finally, Thomas also contends his post-arrest statements must be suppressed because he was never given his *Miranda* warnings before officers engaged in conduct which was reasonably likely to elicit an incriminating response. (Doc. No. 11 at 2-3; Doc. No. 24 at 9-10).

The Fifth Amendment requires that an individual in police custody must be informed of his constitutional rights before the police may interrogate him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The term "interrogation" refers both to express questioning and "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

While officers may not conduct a custodial interrogation unless the suspect first waives his right to remain silent, "the police remain free to converse with the suspect about 'routine incidents of the custodial relationship.'" *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015) (quoting *Oregon v. Bradshaw,* 462 U.S. 1039, 1045 (1982) (per curiam)). The officers did not ask Thomas if he had a

8

gun in his possession or had engaged in other criminal behavior. Instead, the officers' conversation with Thomas revolved around the basis for the arrest warrant and Thomas's recent court appearances. While the circumstances surrounding Thomas's arrest seem unusual – particularly the officers' refusal to inform Thomas of their knowledge of the charge associated with the warrant for his arrest[4] – I conclude the record does not demonstrate the officers' words and actions were reasonably likely to elicit an incriminating response from Thomas.

### IV. CONCLUSION

For the reasons set forth above, I grant Thomas's motion to suppress the evidence recovered from his vehicle and I deny his motion to suppress his statements following his arrest. (Doc. No. 6).

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge

---

[4] Hohenberger offers a plausible safety-related explanation for the officers' refusal to inform Thomas as to the nature of the warrant for his arrest, reasoning he may "want to run or fight" upon learning he was being arrested on a felony charge. (Doc. No. 20 at 35).